### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOSEPH L. COX, JR, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 11-CV-0771-CVE-TLW** |
| | ) | |
| TY KOCH; DR. MARK OATMAN; | ) | |
| OTIS HUGHS; DOUG GOETZ; | ) | |
| NATASHA HART, | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION AND ORDER

    This is a 42 U.S.C. § 1983 civil rights actions commenced by Plaintiff, Joseph L. Cox, Jr.,

a state inmate appearing pro se.[1]  On November 14, 2012, Plaintiff filed a third amended complaint

(Dkt. # 34), alleging claims are based on incidents occurring during his pretrial detention at the OCJ.

In response to the claims raised in the third amended complaint, Defendant Ty Koch, Sheriff of

Osage County, prepared and filed a Special Report.  (Dkt. # 73).  Defendant Goetz filed an amended

---

[1]Although Plaintiff is a state inmate currently incarcerated at Northeast Oklahoma
Correctional Center in Vinita, Oklahoma, all of his claims relate to his pretrial detention at the Osage
County Jail (OCJ). Plaintiff was at the OCJ during the time period spanning from July 18, 2012 to
January 29, 2013.  He was a pretrial detainee from July 18, 2012 to January 7, 2013, and a
Oklahoma Department of Corrections (DOC) inmate waiting for transport from January 7, 2013 until
January 29, 2013.
    Plaintiff filed his original complaint on December 12, 2011. (Dkt. # 1).  He named only one
defendant, Sheriff Ty Koch, and alleged violations of conditions of confinement, failure to "screen"
for a nicotine addiction, and cruel and unusual punishment at the OCJ.  The claims raised in the
original complaint are unrelated to the claims raised in Petitioner's third amended complaint filed
in 2012.  Plaintiff filed a motion to amend his original complaint on December 27, 2011 (Dkt. # 6),
but failed to do so.  The Court terminated the case for failure to comply with an Order of the Court
on March 7, 2012.  (Dkt. # 11).  On September 25, 2012, the Court received Plaintiff's motion to
reopen the case (Dkt. # 15), stating that he was in "drug rehab for over six months" and his mail was
not forwarded.  Petitioner's motion to reopen was granted on October 12, 2012. (Dkt. # 17).

motion to dismiss for failure to state a claim.[2] (Dkt. # 76).  Defendants Koch and Hughs filed a motion to dismiss or, in the alternative, a motion for summary judgment.  (Dkt. # 74).  Defendants Oatman and Hart filed a motion to dismiss  (Dkt. # 75), which was converted to a motion for summary judgment.  (Dkt. # 113).   For the reasons discussed below, the Court shall grant Defendants' dispositive motions.

## BACKGROUND

During the early morning hours of July 18, 2012, Plaintiff was arrested by Osage County Deputy Sheriff Alton Horne.[3]  He was charged in Osage County District Court, Case No. CF-2012-274A, with Conspiracy to Commit a Felony (Count I), Entering with Intent to Steal Copper (Count II), and Resisting Executive Officer (Count III).  (Dkt. # 73-1 at 4-5).  On January 7, 2013, Plaintiff entered guilty pleas and was sentenced to ten (10) years imprisonment on charges filed in Osage County District Court, Case No. CF-2011-082, and to five (5) years imprisonment on a charge of Possession of Contraband by an Inmate, filed in Osage County District Court Case No. CF-2012-454, to be served concurrently with a revoked suspended sentence of twenty (20) years, filed in

---

[2]The original motion to dismiss (Dkt. # 69) was found moot.  See Dkt. # 83.

[3]Plaintiff states in his third amended complaint that he is the victim of a hate crime, but fails to properly raise the claim. See discussion infra., Section B.  Plaintiff alleges, in his own words, that "Deputy Horne pulled me out of his car calling me a stinking spoiled f****** Indian and began beating & stomping me repeatedly telling me he is sending me to prison a cripple." (Dkt. # 34 at 3).

2

Osage County District Court, Case No. CF-2010-051B.[4]  The charges filed in CF-2012-274A were dismissed on January 7, 2013.

Plaintiff identifies five defendants and lists three counts in his third amended complaint.  The defendants are Douglas Goetz, Chief Executive Officer (CEO) of Correctional Healthcare Companies (CHC); Ty Koch, Sheriff of Osage County; Otis Hughs, Jail Administrator at the OCJ; Mark Oatman, M.D., a licensed medical doctor contracted to provide medical services on behalf of CHC; and Natasha Hart,[5] a licensed practical nurse contracted to provide part-time nursing services on behalf of CHC.  CHC is contracted by the OCJ to provide medical care to individuals housed at that facility.  Plaintiff lists three counts in the "Cause of Action" section of the third amended complaint:

Count I:    Deprivation of right to due process by the denial of emergency medical treatment.

Count II:   Denied equal protection by not receiving medical treatment and then forced to endure continued mental abuse.

Count III:  Cruel and unusual punishment and/or treatment by deliberate indifference, neglect and malice with retaliatory acts.

---

[4]In Case No. CF-2010-051B, Plaintiff was charged with and pled guilty to Endeavoring to Manufacture Methamphetamine and sentenced to twenty (20) years imprisonment and a victim compensation assessment of $50,000, all suspended.  On March 24, 2011, Plaintiff was arrested and charged in Case No. CF-2011-082 with Possession of Controlled Substance - Felony (Count I), two counts of Possession of Controlled Substance - Misdemeanor (Counts II and III), and Unlawful Possession of Drug Paraphernalia (Count IV).  This arrest prompted the State to file a motion to revoke Plaintiff's suspended sentence for the 2010 conviction.  On December 22, 2011, by agreement with the State, Plaintiff was allowed to go to "in-patient drug rehab."  Thereafter, on July 18, 2012, Plaintiff was arrested by Deputy Sheriff Horne.

[5]Plaintiff originally listed the name of the nurse as Natasha Parks.  This was corrected to Natasha Hart by the Court on March 29, 2013.  (Dkt. # 72).

3

(Dkt. # 34).  Plaintiff sets forth the "Nature of the Case" as follows: "I have been denied equal protection of the law, guaranteed by the Constitution of the United States, suffered physical, medical neglect & mental abuse by cruel & unusual treatment."  Id. at 5.[6]  Plaintiff's request for relief includes an immediate MRI, change of procedures of jail administration and medical handling, and $75,000,000 in compensation for physical neglect and mental abuse.  Id. at 6.  Plaintiff's claims focus on a back injury and denial of medication and proper diagnosis.  Id.

On December 17, 2012, the Court dismissed without prejudice Plaintiff's equal protection claim (Count II), directed the preparation of a Special Report in accordance with Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978), and ordered service of process by the United States Marshal. (Dkt. # 38).

The Special Report was filed on March 29, 2013 (Dkt. # 73), followed by Defendants' motions to dismiss and motion for summary judgment.  See Dkt. ## 74, 75, 76.  The Special Report includes Plaintiff's Osage County Sheriff's Office file, the contract between CHC and OCJ for medical services, Platintiff's medical records, CHC policies, the policy and procedures regarding medical services for inmates at the OCJ, photos taken of Plaintiff during his booking at the OCJ, the Information page for the Possession of Contraband by an Inmate, and ten supporting affidavits.  See Dkt. ## 73-1 thru 73-19.  In reviewing Plaintiff's claims, the Court has cataloged the medical file in the Special Report.  It includes the following: thirty-six (36) prisoner request forms, six (6) medical progress notes, five (5) provider order pages, nineteen (19) OCJ medication dispersal logs,

_____

[6]The third amended complaint includes handwritten pages and several exhibits in the form of handwritten letters.  Plaintiff assigned exhibit identifiers to each document attached to the third amended complaint.  These exhibits were filed with the complaint as one document. The page numbers referenced for the complaint are the CM/ECF page numbers.  References to the exhibits are as defined by Plaintiff and identified as (Dkt. # 34, Ex. ___).

and seven (7) miscellaneous documents relating to Plaintiff's medical treatment. (Dkt. # 73-3). In

addition, Plaintiff provided two additional request forms in his third amended complaint (Dkt. # 34,

Ex. A), which were not included in the Special Report, bringing the total request forms to thirty-

eight (38).  The request forms span the period from July 21, 2012 to January 15, 2013, with two-

thirds of the requests filed in July, August, and September 2012.  The content of the thirty-eight

request forms include: twelve (12) requests for an MRI; fifteen (15) requests for pain medication;

eighteen (18) requests to see a doctor or for medical attention; seventeen (17) requests related to

medical treatment including copies of x-rays, descriptions of Petitioner's of injuries, and requests

for shoes or extra mat to help with pain; eight (8) complaints of back, neck, face, or leg pain; and

six (6) requests or grievances not specific to medical care, four of which were requests for names

and addresses of the medical staff and the company for which they work.

Plaintiff's medical file shows he received medical treatment, as follows:

- July 31, 2012: Plaintiff started on Naproxen 500 mg, twice a day (Dkt. # 73-3 at 9)
- August 6, 2012: Dr. Oatman changes medication to Motrin 800 mg; orders x-rays of lower back and facial bones and notes the "[patient] seems very focused on civil action" (id. at 12-13)
- August 9, 2012: Plaintiff has x-rays taken by Mobilex; conclusions by Elliot Wagner, M.D., a radiologist, are "mild osteoarthritis of the lumbar spine" and a "report to follow" for the facial x-rays (id. at 17-19)
- August 22, 2012 (on or about): Dr. Oatman noted the results of the x-rays; Plaintiff received a copy of the x-rays and/or x-ray results. It is also noted that Plaintiff is receiving 800 mg of ibuprofen (id. at 26-27)
- August 25, 2012: Appointment scheduled for Plaintiff to see a nurse on August 29, 2012 (id. at 29)
- August 28, 2012: Facial x-ray report, signed by Dr. Elliot Wagner, notes "[t]he osseous structures are unremarkable including grossly intact orbital rims. Maxillary sinuses are unremarkable. No blowout fracture is seen." (id. at 17)
- August 29, 2012: Plaintiff is seen by Defendant Hart and a medical assessment is completed (id. at 35-36)
- September 3, 2012: Dr. Oatman's "Provider Orders" seek a referral for a back specialist and requests they try to identify Plaintiff's previous health care provider for his back condition (id at 13)

5

- September 25, 2012: Dr. Oatman approves Naproxen 500 mg and parfon forte 500 mg (id.)
- October 3, 2012: Request for back specialist submitted to CHC by Nurse Hart, noting that they are waiting for David Coleman, D.C. (Plaintiff's prior back doctor in Texas) to provide additional information and that the conclusions from the x-ray taken was that Plaintiff had "mild osteoarthritis of the lumbar spine." (id. at 45)
- October 3, 2012: Request for referral denied by Raymond Herr, Chief Medical Officer, CHC, stating "management of spine OA is strengthening, stretching, nsaids/analgesic medications, activity modification" (id. at 47)
- October 4, 2012: Plaintiff allowed to have soft shoes to help with back pain and advised to have "family bring shoes" (id. at 50)
- October 5, 2012: Dr. Oatman again attempts to obtain a referral to evaluate Plaintiff's back and to contact Plaintiff's "previous back specialist" because they "need to see if [Plaintiff] had a prev[ious] MRI" (id. at 13)
- October 11, 2012: Dr. Oatman requests an MRI of the lumbar spine to evaluate for disc disease (id.)
- October 25, 2012: Dr. Oatman sends Plaintiff a letter outlining his plan of treatment (id. at 55)
- October 29, 2012: Dr. Oatman meets with Plaintiff to discuss treatment options. Dr. Oatman noted that Plaintiff "gave no objective signs of severe pain" and that he "ambulated into clinic office easily." Dr. Oatman and Plaintiff, with Nurse Hart and Officer Mike Copeland present, outlined the following plan: (1) seek referral to "Pawnee Indian Hospital for evaluation and treatment" of his back; (2) change medication to neurontin for pain; (3) use "'crock' style shoes" for additional pain management; and (4) Ultram would no longer be an option because it was about to become a controlled substance in Oklahoma as of November 1, 2012. Dr. Oatman also sought to contact Plaintiff's back specialist, but the "phone was not answered." Dr. Oatman ordered neurontin 300 mg, twice daily, and requested that arrangements be made to take Plaintiff to the "Pawnee Indian Hospital" for evaluation. (id. at 62-64)
- October 30, 2012: Nurse Hart contacted Pawnee Package Benefit Program. She was told the Pawnee Clinic would not make an appointment for Plaintiff while he was incarcerated. (id. at 65)
- November 15, 2012: Extra bed mat was approved by Nurse Hart (id. at 68)
- November 15, 2012: Plaintiff caught hoarding medication; prescriptions for naproxen, chlorzoxazone, and gabapentin discontinued due to non-compliance (id. at 69)
- November 26, 2012: In response to request filed by Plaintiff on November 18, Dr. Oatman does "not re-order meds" due to Plaintiff's non-compliance. Dr. Oatman will have another doctor review his decision. (id. at 70). Also, Dr. Oatman, in response to request filed November 22, will "re-refer [Plaintiff] for MRI of lumbar spine" even though prior request was denied. (id. at 71)

6

- December 15 or 25, 2012 (handwriting indiscernible): Plaintiff complained of pain and breathing problems; "Dr. started [Plaintiff] on Flexeril 10 mg [and] Tramadol 50 mg." (id. at 75)

The Court notified the parties that the motion to dismiss filed by Defendants Oatman and Hart would be adjudicated as a motion for summary judgment (Dkt. # 113) and directed additional filing pursuant to Fed. R. Civ. P. 12(d).  Plaintiff filed a response. (Dkt. # 114).

## ANALYSIS

**A.      Constitutional standards governing Plaintiff's claims**

**1.      Dismissal standards**

To avoid dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Id.  The complaint must contain  "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  A court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the plaintiff.  Id. at 555.  However, "when the allegations in a complaint, however true, could not raise a [plausible] claim of entitlement to relief," the cause of action should be dismissed. Id. at 558. The Court applies the same standard of review for dismissals under 28 U.S.C. § 1915(e)(2)(B)(ii) that is employed for Fed. R. Civ. P. 12(b)(6) motions to dismiss for failure to state a claim.  Kay v. Bemis, 500 F.3d 1214, 1217-18 (10th Cir. 2007).

A pro se plaintiff's complaint must be construed broadly under this standard.  Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520 (1972). The generous

construction to be given the pro se litigant's allegations "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). A reviewing court need not accept "mere conclusions characterizing pleaded facts." Bryson v. City of Edmond, 905 F.2d 1386, 1390 (10th Cir. 1990); see also Twombly, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (quotations and citations omitted)). The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

Finally, Fed. R. Civ. P. 15 directs the courts to freely provide leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[D]istrict courts may withhold leave to amend only for reasons such as 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment.'" United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1166 (10th Cir. 2009) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

### 2.    Summary judgment standard

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

### 3.    Right to adequate medical care

9

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517 (1984)).   To assert an Eighth Amendment claim, a plaintiff must satisfy a two-prong test – an objective component showing that the deprivation suffered or the conduct challenged was "objectively sufficiently serious," and a subjective component showing that the defendant had a sufficiently culpable state of mind or was "deliberately indifferent" to the inmate's safety.   Farmer, 511 U.S. at 834; Wilson v. Seiter, 501 U.S. 294, 298-99 (1991); Meade v. Grubbs, 841 F.2d 1512, 1530 (10th Cir. 1988); Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir. 1985).  "Deliberate indifference" is defined as knowing and disregarding an excessive risk to an inmate's health or safety.  Farmer, 511 U.S. at 827; Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  The objective element is satisfied "if the condition has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotations omitted). The subjective element is satisfied when a plaintiff shows that the defendant was subjectively aware of a substantial risk of serious harm to an inmate but failed to take steps to alleviate the risk.  Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008).  The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

Negligence does not state a claim under § 1983 for deliberate indifference to medical needs. See Green v. Branson, 108 F.3d 1296, 1303 (10th Cir. 1997).  Differences in judgment between an

inmate and prison medical personnel regarding appropriate medical diagnosis or treatment also are not enough to state a deliberate indifference claim. Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In Sealock v. Colorado, 218 F.3d 1205 (10th Cir. 2000), the Tenth Circuit recognized two types of conduct that may constitute deliberate indifference in a prison medical case: (1) absent negligence, a medical professional failing to treat a serious medical condition properly; and, (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition. Id. at 1211; see also Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980). "[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." Oxendine, 241 F.3d at 1277 n.7 (internal citations and quotation marks omitted). Furthermore, a delay in medical care constitutes a constitutional violation only where the plaintiff can show that the delay resulted in substantial harm. Id. at 1276.

Plaintiff was a pretrial detainee at the time of the acts alleged. A pretrial detainee's right to receive adequate medical care is protected by the Due Process Clause of the Fourteenth Amendment. Id. at 1275 n.6; Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). The Tenth Circuit stated that standing alone, the Due Process Clause "offers prisoners only a 'narrow range of protected liberty interests,' and we do not believe . . . inadequate and delayed medical care falls within that 'narrow range.'" Oxendine, 241 F.3d at 1275 n.6 (citations omitted); see also Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996). Even though the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard nonetheless provides the benchmark for such claims. Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998) (citation omitted); see also Henderson v. Glanz, 2012 WL 5931546 (N.D. Okla. Nov. 27, 2012)

11

(unpublished) ("Because the protections extended to pretrial detainees under the Fourteenth Amendment are at least as broad as those extended to inmates under the Eighth Amendment, the Court need only analyze whether Plaintiff has stated a plausible claim for relief under the Eighth Amendment.").

Count I in Plaintiff's third amended complaint alleges that his right to due process was violated because the "Jail staff" did not allow him to have emergency medical treatment during his booking at the OCJ. (Dkt. # 34).  Because Count I raises a medical care claim while Plaintiff was a pretrial detainee, Count I in Plaintiff's third amended complaint will be analyzed under the Eighth Amendment.

### 4.     Individual capacity liability requires personal participation

Personal participation is an essential element of a § 1983 claim.  Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976); see also Garrett v. Stratman, 254 F.3d 946, 950 n.4 (10th Cir. 2001) (noting that medical official must have "played a role in the challenged conduct" to be liable for an Eighth Amendment violation).  As a result, government officials have no vicarious liability in a section § 1983 suit for the misconduct of their subordinates because "there is no concept of strict supervisor liability under section 1983."  Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996) (quotation omitted).  In other words, § 1983 does not authorize liability under a theory of respondeat superior.  Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011).  Instead, a supervisor is liable only if he is "personally involved in the constitutional violation and a sufficient causal connection . . . exist[s] between the supervisor and the constitutional violation."  Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006) (quotation omitted).  This means that a plaintiff must show an affirmative link exists between the constitutional deprivation and either the supervisor's personal

participation, his exercise of control or direction, his acquiescence in the constitutional violation, or his failure to supervise. See Id. at 1151; Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1187 (10th Cir. 2001); Worrell v. Henry, 219 F.3d 1197, 1214 (10th Cir. 2000); Green v. Branson, 108 F.3d 1296, 1304 (10th Cir. 1997); Winters v. Bd. of County Comm'rs, 4 F.3d 848, 855 (10th Cir. 1993).

### 5.   Official capacity liability requires policy or established custom

Claims against a government officer in his official capacity are actually claims against the government entity for which the officer works. Kentucky v. Graham, 473 U.S. 159, 167 (1985). Because § 1983 does not recognize the theory of respondeat superior as a basis for liability, in order to succeed on an official capacity claim against a county official under § 1983, a plaintiff must allege that he suffered injuries of a constitutional magnitude as the result of an official policy, custom, or practice. Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978); Meade, 841 F.2d at 1529. A plaintiff may show a policy by demonstrating a pattern of conduct or series of acts which reasonably imply the existence of a policy or custom. See Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985). The plaintiff may also demonstrate that an action was taken as a result of policy, by showing that the constitutional injury resulted from the action or decision of an individual with final policy making authority with respect to the action ordered. Pembaur v. City of Cincinnati, 475 U.S. 469, 482 (1986). However, "a municipality cannot be liable under § 1983 for acts of a municipal official in his official capacity 'unless that official possesses final policymaking authority to establish municipal policy with respect to acts in question.'" Coyle v. Ludwig, 2006 WL 1064197, at * 1 (N.D. Okla. Apr. 5, 2006) (quoting Jantzen v. Hawkins, 188 F.3d 1247, 1259 (10th Cir.1999) (quoting Houston v. Reich, 932 F.2d 883, 887 (10th Cir.1991))); see also City of

14

<u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985) ("the word 'policy' generally implies a course of action consciously chosen from among various alternatives").

**B.      Preliminary considerations**

As a preliminary matter, Plaintiff makes two undeveloped allegations in his third amended complaint that require brief attention.  First, Plaintiff claims, repeatedly, that the injuries for which he sought medical care at the OCJ were the result of a "hate crime" at the hands of the Osage County Deputy Alton Horne.  (Dkt. # 34 at 2-4).  Plaintiff's third amended complaint includes a copy of a letter he claims he sent to the Federal Bureau of Investigation (FBI), dated October 23, 2012, raising these allegations against Deputy Horne.  (Dkt. # 34, Ex. B-1).  However, Plaintiff failed to raise the alleged "hate crime" civil rights violation as a cause of action in his third amended complaint. Instead, Plaintiff chose to allege claims relating to medical care received at the OCJ.  Further, Deputy Horne is not, nor has he ever been, a named defendant in this § 1983 action.  Thus, the Court will not address any claim against Deputy Horne and makes no judgment as to the veracity of Plaintiff's assertions.

The second undeveloped allegation is a repeated assertion of a "cover-up" by the Defendants to protect Deputy Horne.  Plaintiff includes a handwritten page in his third amended complaint listing Defendants Otis Hughs, Natasha Hart, and Doug Goetz as defendants. (Dkt. # 34 at 2).  On this page, Plaintiff states that both Defendant Hart and Defendant Hughs are concealing the extent of his injuries in order to cover up the alleged "hate crime."  Specifically, Plaintiff claims Defendant Hughs is trying "to cover up the assault, brutal hate crime committed by Alton Horne as medical neglect being the cloak of concealment."  <u>Id.</u>  Plaintiff claims Defendant Hart "deliberately failed to respond to medical needs and request[s], that in concert with jail administrators she has

14

done her best to cover up and conceal injuries substanded [sic] at the hand of 'Alton Horne.'" <u>Id.</u>
Plaintiff repeats these allegations in several of the exhibits attached to his third amended complaint
and in his responsive filings, and ultimately alleges that all of the Defendants are part of the cover-
up.  However, Plaintiff did not raise his conspiracy claim as a cause of action in his third amended
complaint and it is not properly before the Court.  Even if the claim were before the Court, it would
be dismissed because Plaintiff fails to provide any information or facts to support this assertion.
Plaintiff's vague and conclusory allegations fail to state a claim on which relief may be granted.  <u>See</u>
<u>Bixler v. Foster</u>, 596 F.3d 751, 756 (10th Cir. 2010) ("[A] complaint must contain sufficient factual
matter, accepted as true, to state a claim for relief that is plausible on its face.") (internal quotation
marks omitted).  To state a conspiracy claim, a plaintiff is required to "allege specific facts showing
agreement and concerted action." <u>Hunt v. Bennett</u>, 17 F.3d 1263, 1266 (10th Cir. 1994).  Plaintiff's
third amended complaint falls far short of these standards.  Plainly stated, Plaintiff offers only his
own conclusory statements alleging conspiracy and concealment.  These are insufficient to raise a
claim of conspiracy.

Finally, Plaintiff filed a motion to "disqualify immunity."  (Dkt. # 115).  In light of this
Opinion and Order, Plaintiff's motion shall be declared moot.

**C.      Resolution of Defendants' dispositive motions**

Turning now to the dispositive motions, the Court notes that Plaintiff responded to each motion to dismiss and motion for summary judgment individually.  See Dkt. ## 90, 92, 93.  Yet, in each response, Plaintiff presents arguments and information relating to all Defendants and all claims, and does not specifically address the arguments set forth by each Defendant.  Therefore, in adjudication of the motions for summary judgment, the Court will review the record as a whole and consider all information presented by Plaintiff in all of his responses.  See Dkt. ## 90, 92, 93, 97, 100, 101, 114.

Additionally, Defendants Koch and Hughs filed a joint motion to dismiss or in the alternative, a motion for summary judgment. (Dkt. # 74).  After reviewing the third amended complaint, the motion, and response, the Court finds it necessary to consider material outside the pleadings as to Defendant Hughs.  For that reason, the Court will adjudicate Defendant Koch's motion as a motion to dismiss and Defendant Hughs' motion as a motion for summary judgment. Defendants Oatman and Hart filed a motion to dismiss for failure to state a claim upon which relief may be granted.  (Dkt. # 75). The Court notified the parties that, pursuant to Fed. R. Civ. P. 12(d), it would proceed with Defendants Oatman and Hart's motion as a motion for summary judgment. (Dkt. # 113).  Plaintiff filed a response. (Dkt. # 114).

For the reasons discussed below, the Court (1) grants Defendant Goetz's amended motion to dismiss for failure to state a claim, (2) grants Defendant Koch's motion to dismiss, (3) grants summary judgment for Defendant Hughs, and (4) grants summary judgment for Defendants Oatman and Hart.

### 1.      Defendant Douglas Goetz, CEO of CHC

It is undisputed that CHC is contracted by the OCJ to provide health care for the inmates housed at that facility.  Plaintiff alleges that Defendant Goetz, CHC's chief executive officer, was aware of the "blatant and malicious medical neglect" at OCJ.  (Dkt. # 34 at 2).  Defendant Goetz argues that Plaintiff's claims against him should be dismissed under Fed. R. Civ. P. 12(b)(6).  Defendant Goetz asserts four arguments as grounds for dismissal.  Plaintiff filed two responses (Dkt. ## 92, 100) and Defendant filed a reply (Dkt. # 96).

### a.      No personal participation by Defendant Goetz

Defendant Goetz argues that under 42 U.S.C. § 1983, he is liable only if he personally participated in the civil rights violation.  (Dkt. # 76 at 7) (citing Mitchell v. Maynard, 80 F.3d 1433 (10th Cir. 1996)).  Defendant asserts that he "had no participation in any of the constitutional violations that Plaintiff has alleged," had "no involvement with the healthcare and treatment," and has never "diagnosed or assessed" Plaintiff.  Id.  Plaintiff responds that "Defendant Goetz was notified on many occasions concerning the neglect and medical needs of the Plaintiff."  (Dkt. #92 at 2).[7]  Plaintiff states that "each time [he] thoroughly explain[ed] his condition, what lead to it and the lack of proper care or diagnosis."  Id.  Plaintiff "assume[s] the request should have gotten the attention of C.E.O. for C.H.C. Doug Goetz considering he had received many letters" from Plaintiff.  Id. at 6.  This assumption leads Plaintiff to conclude that CHC was aware of his medical issues and that Defendant Goetz "made sure no referral was approved for an outside source" to examine his injuries because it would "expose" the seriousness of his injuries, which "his associates had been

_____

[7]Plaintiff included in his third amended complaint, a copy of a single certified letter he sent to Defendant Goetz.  See Dkt. #34, Ex. C-6.

trying to keep concealed in order to protect another Executive Officer Alton Horne." Id. at 9. Defendant Goetz argues that Plaintiff's statements are "mere conclusory allegations to defeat the motion to dismiss" and that "Plaintiff failed to set forth any argument or law that receiving such letters amounts to a constitutional violation." (Dkt. # 96 at 5, 7).

Construing Plaintiff's third amended complaint broadly and in a light most favorable to Plaintiff, this Court finds that Plaintiff fails to show personal involvement, an affirmative link, or a sufficient causal connection between Defendant Goetz and the alleged constitutional violations. Merely sending correspondence to Defendant Goetz stating a grievance, is not sufficient to establish personal participation as required under § 1983. Davis v. Arkansas Valley Corr. Facility, 99 F. App'x 838, 843 (10th Cir. 2004) (unpublished)[8]; see also Escobar v. Reid, 668 F. Supp. 2d 1260, 1291 (D. Colo. 2009); Harper v. Rudek, 2011 WL 7112305 (W.D. Okla. Dec. 16, 2011) (unpublished). Without additional information sufficiently linking Defendant Goetz to the actions of the medical staff at the OCJ, Plaintiff fails to state a claim against Defendant Goetz.

### b.    No deliberate indifference by Defendant Goetz

Defendant's second argument for dismissal is that Plaintiff cannot "maintain a claim . . . for violation of the Eighth Amendment" because Defendant Goetz "lacks the requisite state of mind to support Plaintiff's Eighth Amendment claim." (Dkt. # 76 at 9).  Plaintiff supports his claim of deliberate indifference with Exhibits C-1 through C-6 of the third amended complaint. See Dkt. # 34 at 6.  These exhibits consist of letters from Plaintiff addressed to various individuals alerting them to his pain, need for medication, and the alleged "hate crime."  One letter, dated November 3, 2012,

---

[8]This and any other unpublished disposition cited as persuasive authority pursuant to Tenth Circuit Rule 32.1.

is addressed to Defendant Goetz.  (Id., Ex. C-6).  Although Plaintiff states that he wrote letters to Defendant Goetz "in order to exhaust all administrative remedies" (Dkt. # 92 at 8), only one is of record.

Plaintiff relies on a presumption that Defendant Goetz personally received the letters and concludes that Defendant Goetz then took actions denying medical treatment for Plaintiff while he was detained at OCJ.  Plaintiff offers no facts or information to support this conclusion or to show that Defendant Goetz had the requisite state of mind to support an Eighth Amendment claim.  As stated above, a letter notifying a defendant of grievances, without more, is insufficient to give rise to a claim.  Nothing in the third amended complaint or in Plaintiff's responses is sufficient to satisfy the two-prong test set forth in Wilson.  Plaintiff's claim against Defendant Goetz is dismissed.

### c.      Immunity

Defendant Goetz argues he is entitled to immunity under the Eleventh Amendment or, in the alternative, qualified immunity.  The OCJ contracted with CHC to provide healthcare services for the OCJ. (Dkt. # 76).  Defendant Goetz argues that, "to the extent Plaintiff may be asserting that Defendant Goetz acted under color of state law in providing medical treatment to the Osage County Jail, Defendant Goetz is immune . . . by virtue of the Eleventh Amendment."  (Dkt # 76).  Plaintiff's only counter argument is that "no umbrella of immunity should stand."  (Dkt. # 92 at 10).  "In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities." Steadfast Ins. Co. v. Agricultural Ins. Co., 507 F.3d 1250, 1253 (10th Cir. 2007) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274 (1977)). Eleventh Amendment immunity does not apply.

Qualified immunity is discussed infra., Section D.

### d.       Dismissal of due process claim

Defendant Goetz argues Plaintiff's due process claim should be dismissed.  (Dkt. # 76 at 11-12).  As discussed above, Plaintiff's due process claim (Count I) will be analyzed under the Eighth Amendment standard.  Plaintiff alleges his right to due process was deprived because the "Jail staff" did not allow him to have emergency medical treatment during his booking at the OCJ.  (Dkt. # 34).  Plaintiff does not allege any specific acts or omissions by Defendant Goetz during Plaintiff's booking.  Therefore, Plaintiff's third amended complaint fails to allege sufficient facts to support a claim against Defendant Goetz as to lack of emergency medical care during booking. This claim is dismissed against Defendant Goetz.

### e.       Summary as to Defendant Goetz

For the reasons discussed above, the Court finds that Plaintiff fails to state a claim upon which relief can be granted against Defendant Douglas Goetz.  The Court also finds that it would be futile to allow Plaintiff to further amend his third amended complaint. All claims against Defendant Goetz are dismissed with prejudice.

### 2.       Defendant Ty Koch, Sheriff, Osage County

Defendants Koch and Hughs jointly filed a motion to dismiss or, in the alternative, a motion for summary judgment.  (Dkt. # 74).  After reviewing the third amended complaint, the Court finds it necessary to analyze the motion under separate standards for each defendant.  The Court will evaluate Plaintiff's claims against Defendant Koch under the dismissal standard and Plaintiff's claims against Defendant Hughs under the summary judgment standard.

Defendant Ty Koch is the Osage County Sheriff and his responsibilities include overseeing the OCJ.  Defendant Koch raises two propositions in the motion to dismiss: (1) Plaintiff cannot

demonstrate a violation of his constitutional rights by Defendant Koch, and (2) Defendant Koch is entitled to qualified immunity in his individual capacity with regard to Plaintiff's 42 U.S.C. § 1983 claims. (Dkt. # 74).  Plaintiff responded to the motion, (Dkt. # 93), Defendant replied. (Dkt. # 99), and Plaintiff filed a surreply (Dkt. # 101).

<b>a.      No constitutional violation by Defendant Koch</b>

Defendant Koch argues that Plaintiff has failed to demonstrate that Koch had any personal involvement "in any decisions concerning the medical care provided or not provided" by CHC medical staff. (Dkt. # 74 at 21).  Plaintiff can show only that Defendant was in "receipt of some correspondence in which Plaintiff requested or complained about medical care."  Id.  Defendant Koch states that he forwarded the correspondence to the OCJ for review and appropriate action.  Id. At no time did Defendant Koch speak with "Jail or CHC staff concerning any medical issue with Plaintiff" nor did he "assert any personal involvement" in any decision concerning Plaintiff's medical care.  Id.  Additionally, Defendant Koch states that he "was never advised by any person that [Plaintiff's] medical issues were not being addressed or that CHC staff was delaying or denying him any medical care."  Id. at 15.

Plaintiff claims that "Ty Koch has continually maintained a deliberate indifference to the point of abuse and injury."  (Dkt. # 34 at 1).  Plaintiff's third amended complaint includes copies of four letters sent to Defendant Koch dated September 4, 2012 (id., Ex. B-10), September 11, 2012 (id., Ex. B-9), September 20, 2012 (id., Ex. B-8), and November 4, 2012 (id., Ex. C-5).  In each of these letters, Plaintiff identified his claims against Deputy Sheriff Alton Horne, his grievances against the medical staff, and accuses Defendant Koch of being part of the "cover-up and neglect." See Dkt. # 34.  Yet, Plaintiff fails to offer more, stating that "Ty Koch was continually aware of the

21

issues." (Dkt. # 93 at 14). These "bare allegations" made by Plaintiff are insufficient to establish personal participation in an alleged violation of Plaintiff's constitutional rights. See Davis, 99 F. App'x at 843; Doyle v. Cella, 2008 WL 4490111 (D. Colo. Sept. 30, 2008); Crowder v. Lash, 687 F.2d 996, 1006 (7th Cir. 1982) (concluding that finding liability on the basis of prisoner's letters to a jail Commissioner was too broad of a theory of liability and "inconsistent with the personal responsibility requirement for assessing damages against public officials" under § 1983).

In Plaintiff's third amended complaint, he also implies that he was moved out of the "medical dorm" at the OCJ and into "maximum lock down" in retaliation for filing this action. (Dkt. # 34). Defendant Koch argues that he had "no involvement in decisions concerning the housing assignments of the plaintiff" and "did not instruct any staff member as to where to place" Plaintiff while he was a pre-trial detainee at the OCJ. (Dkt. # 74 at 21-22). Plaintiff offers no facts or information as to the role Defendant Koch played in his housing assignments. His statements that "Ty Koch has continually maintained a deliberate indifference to the point of abuse and injury" (Dkt. # 34) and that "Ty Koch was notified many times by letter and registered mail" (Dkt. # 93) are insufficient to find personal participation in the alleged constitutional violations or retaliatory acts against Plaintiff. Further, to the extent Plaintiff may be raising claims against Defendant Koch under a theory of respondeat superior, there is no such liability under § 1983. See Serna, 455 F.3d at 1151; Brown v. Montoya, 662 F.3d at 1164. Plaintiff fails to show an affirmative link between the alleged constitutional violations and Defendant Koch's supervisory role as Sheriff.

Finally, Defendant Koch argues that, inasmuch as Plaintiff has sued him in his official capacity, the claims against him "must be premised upon the existence of an unconstitutional policy or custom." (Dkt. # 74 at 28). Plaintiff does not allege, nor does the record suggest, that any alleged

22

constitutional violation was caused by an unconstitutional policy or custom at the OCJ.  See Tuttle, 471 U.S. at 821-22.  To the extent that Defendant Koch is sued in his official capacity, he is entitled to dismissal.

### b.      Qualified Immunity

Defendant Koch argues that he is entitled to qualified immunity against all of Plaintiff's claims.  (Dkt. # 74 at 35).  Qualified immunity is discussed infra., Section D.

### c.      Summary as to Defendant Koch

For the reasons stated and discussed, the Court finds that Plaintiff failed to state a claim upon which relief can be granted against Defendant Koch.  The Court also finds that it would be futile to allow Plaintiff to further amend his third amended complaint.  Plaintiff's claims against Defendant Koch are dismissed with prejudice.

### 3.      Defendant Otis Hughs, Osage County Jail Administrator

Defendant Otis Hughs is the Jail Administrator and is responsible for the day-to-day operations of the OCJ.  (Dkt. # 74 at 11).  Defendants Hughs filed a joint motion to dismiss, or in the alternative, a motion for summary judgment with Defendant Koch.  (Dkt. # 74).  For the reasons discussed above, the Court will adjudicate Defendant Hughs' motion as a motion for summary judgment.  Defendant Hughs raises two propositions: (1) Plaintiff cannot demonstrate a violation of his constitutional rights by Defendant Hughs, and (2) Defendant Hughs is entitled to qualified immunity in his individual capacity with regard to Plaintiff's § 1983 claims. (Dkt. # 74).  Plaintiff responded to the joint motion (Dkt. # 93), Defendant replied (Dkt. # 99), and Plaintiff filed a surreply (Dkt. # 101) .

Construed broadly, Plaintiff's third amended complaint alleges that Defendant Hughs, "manipulated and tr[ied] to cover up the [alleged] assault" (Dkt. # 34 at 2), that "jail administrators . . . continued a deliberate indifference" to his medical needs (id. at 6), that Defendant Hughs intercepted and confiscated Plaintiff's mail (id. at 4; see also id. at C-2), and that Defendant Hughs did not comply with a court order to transport Plaintiff for medical care (id. at C-3). Plaintiff also implies that he was moved out of the "medical dorm" at the OCJ and into "maximum lock down" in retaliation for filing this action. Finally, the third amended complaint includes letters addressed to Defendant Hughs with statements concerning the alleged excessive force by Deputy Horne and requests to see a doctor. As discussed above, merely sending correspondence to Defendant Hughs stating a grievance is not sufficient to establish his personal participation in an alleged constitutional violation as required under § 1983. Davis, 99 F. App'x at 838. There must be personal participation by Defendant Hughs in order for there to be liability. Plaintiff's specific allegations against Defendant Hughs fall loosely into the Count III claims of deliberate indifference, cruel and unusual punishment, and retaliatory acts by jail staff. See Dkt. # 34.

### a.   No personal participation by Defendant Hughs

The OCJ has a policy requiring appropriate medical care, but "the manner in which the medical care is provided ha[s] effectively been superseded as a result of hiring" CHC to provide the medical care to the inmates. (Dkt. # 73-6). This is because the "Osage County Jail and Jail staff leave all medical decisions to CHC and its staff." (Dkt. # 74 at 6). Only "if it were obvious to [jail] staff that CHC . . . was not providing medical care, as reasonably necessary, [would jail] staff, after consultation with [Defendant Hughs] . . . have authority to make a request to CHC staff to provide medical care, or if required, to seek outside medical care." Id.

Plaintiff argues that "even a lay person would have administered" appropriate medical treatment to "a 54-year old man of small stature, head and face scraped, swollen, and bruised, one eye being completely swollen closed." (Dkt. # 93 at 6). Plaintiff states that the OCJ had the "ability to take appropriate medical action, but chose not to" and that Defendants should have called an ambulance "in an effort to provide complete and appropriate medical care." (Dkt. # 93 at 5, 6). Plaintiff claims Defendant Hughs "ignored" his medical needs, constituting "medical neglect." (Dkt. # 34). Construed broadly and in a light most favorable to Plaintiff, Plaintiff implies that Defendant Hughs should have taken some action upon receiving correspondence describing Plaintiff's medical needs and the alleged reason behind his injury.[9]

Defendant Hughs argues that Plaintiff cannot establish personal participation for the "claimed deprivation" of a constitutional right and that Plaintiff failed to satisfy the objective and subjective elements for deliberate indifference to a prisoner's serious medical needs under the Eighth Amendment. (Dkt. # 74). Defendant argues that, even though he has "constant contact" with CHC staff by virtue of his role as Jail Administrator, at no time did he have a role in deciding the medical care of Plaintiff. Id. at 22.

The Court agrees with Defendant Hughs. Plaintiff fails to provide sufficient information to show Defendant Hughs was personally involved in the alleged constitutional violations. The fact Defendant Hughs received letters citing grievances against the medical staff is insufficient to attach

---

[9]In his Surreply (Dkt. # 101), Plaintiff, in exasperation, states that, "Defendants . . . within themselves show a clear vision of deliberate indifference." Id. at 2. He then quotes William Shakespeare's "Merchant of Venice," stating "How shal[t] thou hope for mercy, rendering none!" Id.

25

§ 1983 liability.  The implication by Plaintiff that Defendant Hughs should have sought medical care for Plaintiff upon receipt of the letters is insufficient evidence to survive summary judgment.

Plaintiff's accusation that Defendant Hughs failed to follow a court order directing him to transfer Plaintiff for medical treatment is simply not supported by the record.  The record does not show that an order was entered by this or any other court directing Defendant Hughs or any member of the OCJ staff to transport Plaintiff for medical care.[10]  Nor does a search of Osage County District Court records (www.oscn.net) reveal such an order.   Plaintiff's claim may be based on a misunderstanding of events.  The record reflects that Plaintiff was told by CHC medical staff that they would seek permission for Plaintiff to see a back specialist.  (Dkt. ## 75 at 5, Dkt. # 73-3 at 62).  Requests submitted directly to CHC were denied.  (Dkt. # 73-3).  CHC medical staff also submitted a request to the Pawnee Benefit Package Program, seeking an appointment for Plaintiff to see a specialist at the Pawnee Clinic.  (Dkt. # 73-3 at 65).  However, that request was denied by the Pawnee Benefit Package Program because the Pawnee Clinic would not schedule an appointment for Plaintiff while he was incarcerated.  Id.  There is nothing in the record suggesting the existence of a court order regarding medical treatment.  Therefore, based on the record before the Court, Defendant Koch did not violate or interfere with a court order.  This claim has no merit.

Plaintiff also claims that Defendant Hughs "intercepted [and] confiscated" a second set of x-ray reports sent by Dr. Elliot Wagner, the radiologist who x-rayed Plaintiff in August 2012.  (Dkt. # 34, Ex. C-2).  Plaintiff claims that Dr. Wagner sent him a letter, dated "on or about" September 10, 2012, telling Plaintiff that he would send "his true reports, conclusions, and the x-rays."  (Dkt.

---

[10]The Special Report includes an "Order to Transport" issued by the Trial Court of the Osage Nation Criminal Division, "directing transportation" of Plaintiff "to the Tribal Court" for a scheduled trial date.  (Dkt. # 73-1 at 16).

# 34, Ex. C-2).  Plaintiff claims that the "true reports" sent by Dr. Wagner did not arrive as "the result of [Defendant Hughs'] influence." Id. Plaintiff claims Defendant Hughs told him that "no second reports were needed because he was not hurt." (Dkt. # 90 at 5).

Prison officials may regulate the content of incoming mail and properly ban items, but they may not "restrict mail simply to harass inmates or confiscate mail that complies with prison policy." Gee v. Pacheo, 627 F.3d 1178, 1188 (10th Cir. 2010). The record includes three documents, all generated by Plaintiff, that reference Plaintiff's requests for the x-rays and reports from Dr. Wagner. The first is a letter dated August 31, 2012 from Plaintiff to Dr. Wagner requesting "verification that [Dr. Wagner's] conclusion may also indicate ruptured disks and require an MRI" (Dkt. # 97 at 23). The others are two OCJ prisoner request forms dated September 11, 2012 and October 2, 2012, which reference the x-rays or reports.  The September 11, 2012 request form shows that Plaintiff requested "legal documents . . . from Mobilex USA out of Plano, Texas" (Dkt. # 34, Ex. A-10).  The October 2, 2012 request form shows Plaintiff requested "the x-rays sent to me by Doctor Wagner of Plano, Tx."  (Dkt. # 73-3 at 43).  However, of the dozens of request forms included in the record, these are the only two that reference Mobilex or Dr. Wagner or, for that matter, even hint at mail confiscation by Defendant Hughs or any other member of the OCJ staff.  Additionally, Plaintiff fails to provide any evidence showing that Dr. Wagner was sending a report and x-rays to Plaintiff.  In fact, Plaintiff was provided a copy of the x-ray results around August 23, 2012 (Dkt. # 73-3 at 26, 27, 28, 29), and then proceeded to file prisoner request forms for medical care based on his perceived results of the x-rays. Id. at 27, 29, 32.

In Gee, the Tenth Circuit did not place a heightened pleading requirement on prisoners requiring them to affirmatively link an alleged unconstitutional act to a legitimate penological

interest.  Rather, <u>Gee</u> and others, "require the Court to analyze the penological interest of any act in a prison that is alleged to be unconstitutional."  <u>Pena v. Greffet</u>, 922 F. Supp. 2d 1187, 1241-42 (D.N.M. 2013) (citations omitted).  Therefore, even if Plaintiff could have alleged facts sufficient for the Court to plausibly infer that the x-rays were mailed from Dr. Wagner to Plaintiff and that Defendant Hughs had confiscated them, it would be a reasonable and legitimate penological interest to not have x-rays in the possession of inmates while incarcerated at the OCJ and would not be a violation of Plaintiff's constitutional rights.  Upon review of the record in the light most favorable to Plaintiff, the Court finds there is no genuine dispute as to any material fact and Defendant Hughs is entitled to judgment as a matter of law as to Plaintiff's claim that Defendant Hughs confiscated his mail.

Plaintiff claims he was not allowed emergency medical treatment by jail staff when he was booked at the OCJ.  (Dkt. # 34 at 5).  Plaintiff argues that, if his injuries were serious enough to take photographs, then the jail staff should have called an ambulance.  (Dkt. # 93 at 5).  When Plaintiff arrived at the OCJ, he claimed had been beaten by Deputy Sheriff Horne.  The booking officers observed that Plaintiff had a scrape, dried blood, and possible bruising on his face.  <u>See</u> Dkt. ## 73-5 and 73-16.  Officer DeHaven took photographs to document "any injuries or the lack of serious injuries" of the Plaintiff.  (Dkt. # 73-5).  Both of the officers stated that they did not observe any more serious bruising or other injuries to Plaintiff.  (Dkt. ## 73-5 and 73-16).  After a thorough review of the record, this Court finds that at no time did these officers contact Defendant Hughs or indicate that they were operating under a directive from Defendant Hughs.  At no point does Plaintiff directly implicate or affirmatively link Defendant Hughs to the actions taken by jail staff upon his arrival at the OCJ.  Plaintiff states only that Defendant Hughs "was constantly involved concerning

28

these issues, verbally and by mail and is directly responsible." (Dkt. # 93 at 5). Without more, Plaintiff's claims are speculative and fail to show Defendant Hughs had any personal participation in Plaintiff's booking. Thus, Plaintiff fails to offer evidence sufficient to give rise to liability under § 1983. Summary judgment for Defendant Hughs is appropriate on this claim.

Plaintiff next claims that he was moved out of the medical dorm and into "maximum lock down" as "retaliation for filing the 1983 civil action." (Dkt. # 34 at 6 and Ex. C-3, C-5). Plaintiff alleges this housing reassignment was done despite the fact that he had a "documented medical history of herniated discs of the lumbar spine and in need of medication for life." (Dkt. # 93 at 12). Plaintiff alleges the "jail staff wanted to demonstrate their supreme power to do or stage anything." Id.

It should be noted that there is no "medical unit" at the OCJ, only a unit where "inmates deemed to be high maintenance" are housed. (Dkt. # 74 at 14). "High maintenance" inmates are those that need protective custody, have medical issues that require continual oversight, the elderly, or those inmates that cannot protect themselves. Id. Decisions to move an inmate out of the maintenance unit occur when there is a need to "house other high maintenance inmates." Id. Plaintiff was placed in the "high maintenance" unit when he arrived at OCJ on July 18, 2012, and moved out of the unit on or about October 25, 2012. (Dkt. # 34, Ex C). Defendant Hughs states that he had no role or personal participation in the decision to move Plaintiff from one unit to another. (Dkt. # 74 at 22). Instead, it is the jail staff that has "the authority to make decisions concerning the housing assignments of inmates." (Dkt. # 73). Defendant Hughs further argues that the change in Plaintiff's housing assignment was not an act of retaliation, but a "proper exercise of the jail staff's discretion" in making housing decisions based on the needs of the inmates and the "supervision and

control of inmates within the Jail." (Dkt. # 74 at 15). Once the OCJ staff determined that Plaintiff was no longer in need of continuous monitoring after "observations and medical exams" indicated[11] that Plaintiff appeared able to "move around and protect himself" (id.), Plaintiff became "a likely candidate to be moved to a general population unit." (Dkt. # 73 at 23).

Prisoners generally have no liberty or property interest in a specific classification or housing assignment unless the classification imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). "The determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some other legitimate government purpose." Peoples v. CCA Detention Centers, 422 F.3d 1090, 1106 (10th Cir. 2005) (citing Bell v. Wolfish, 441 U.S. 520, 538 (1979)). Only if the act of reassigning housing for a detainee is done with an intent to punish, does that act become unconstitutional. Id.

In addition, "prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights . . . . [However,] [a]n inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." Fogle v. Pierson, 435 F.3d 1252, 1263-64 (10th Cir. 2006) (quoting Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998)); see also Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990). For example, a plaintiff must demonstrate that his pursuit of administrative or judicial remedies was

---

[11]Although there is nothing in the record to show what specific information was considered by the jail staff in determining Plaintiff was eligible to go into general population, the Court notes an observation made by Defendant Oatman soon after Plaintiff's reassignment. On October 29, 2012, a few days following the transfer of Plaintiff from the "high maintenance" unit into the general population, Plaintiff was seen by Dr. Oatman. In Dr. Oatman's notes of this visit he writes, Plaintiff "ambulated into clinic office easily and again gave no objective signs of severe pain." (Dkt. # 73-3 at 62).

the "but for" cause of the retaliatory action.  See Purkey v. Green, 28 F. App'x 736, 746 (10th Cir.

2001) (unpublished) (citing Peterson, 149 F.3d at 1144).  "Mere allegations of [unconstitutional

retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because

of the exercise of the prisoner's constitutional rights." Frazier v. Dubois, 922 F.2d 560, 562 n.1 (10th

Cir. 1990).

Plaintiff fails to allege specific facts showing retaliation.  Plaintiff offers only the timing of

his civil lawsuit[12] and a statement to Plaintiff by an unnamed individual that Plaintiff  no longer had

medical problems.  (Dkt. # 34, Ex. C-3, C-4, C-5, C-6).  Plaintiff's allegations are, at most,

speculative. While he undeniably engaged in protected activity in filing a civil rights complaint, that

alone does not establish the requisite causal connection for his retaliation claim.  He fails to make

any allegation of fact supporting a claim that his filing this case was the "but for" cause of the

alleged retaliatory action.  Cf. Ogle, 435 F.3d at 1263 (finding arguable basis for retaliation claim

where plaintiff alleged that, in response to his complaints about placement in segregation and threats

to file suit, a DOC official told him "that if he did not stop complaining he would be transferred to

long-term administrative segregation at another facility," plaintiff did not stop complaining, and he

was subsequently transferred).  There are insufficient facts in this record to find that Plaintiff's

housing reassignment was for a reason other than a legitimate government purpose.

As an alternative argument against liability, Defendant Hughs argues that the "decisions

regarding [Plaintiff's] care simply cannot be attributed to [him]."  (Dkt. # 74 at 23).  Defendant

states that "non-medical prison personnel cannot be held liable for deliberate indifference to a

---

[12]Plaintiff filed his complaint on December 12, 2011 (Dkt. # 1), and a first amended complaint on October 20, 2012 (Dkt. # 17).  The third amended complaint was not filed until November 14, 2012. (Dkt. # 34).  See supra note 1.

prisoner's serious medical needs if the prisoner is under the care of medical personnel." Id. at 23 (citing Spruill v. Gillis, 372 F.3d 218, 235-36 (3d Cir. 2004)).  However, the Tenth Circuit, citing Spruill favorably and summarizing the holdings of several circuit courts, found that "it has been clearly established for over a decade that unreasonable reliance on the advice of a medical professional will not excuse deliberate indifference to a prisoner's serious medical needs." Weatherford ex rel. Thompson v. Taylor, 347 F. App'x 400, 404 (10th Cir. 2009).  Even though Defendant Hughs argues that he cannot be held liable because Plaintiff was under the care of medical staff, this reliance on the medical staff must be reasonable.

Plaintiff appears to argue that it was not reasonable for Defendant Hughs and the OCJ staff to rely on the opinions of the CHC medical staff.  Specifically, Plaintiff is critical of Defendant Hart and her evaluation of him after his arrival at the OCJ.  (Dkt. # 93 at 7; Dkt. # 92 at 3; Dkt. # 90 at 5).  Plaintiff challenges Defendant Hart's ability to "determine broken bones or a damaged spine" (Dkt. # 90 at 5) after seeing him covered in scrapes and bruises with "one eye swollen shut."  (Dkt. # 92 at 3).  Plaintiff also challenges the diagnosis of his injury by Defendant Oatman because Defendant Oatman did not order an MRI and his diagnosis relied on Defendant Hart's opinion.  Id. Finally, Plaintiff challenges the determination by the medical staff that he "had no medical issues" prior to his housing reassignment. (Dkt. # 34, Ex. C-3, C-4, C-5, C-6).  Plaintiff points to the fact that the next day, following his reassignment, Plaintiff received a letter from Defendant Oatman affirming that Plaintiff has "well documented . . . serious back conditions" and verifying Plaintiff's "medical issues and medical needs."  (Dkt. # 34, Ex. C-4, C-5; see also Dkt. # 34, Ex. C-A).  Taken together and construed broadly, Plaintiff argues that it was not reasonable for Defendant Hughs to

rely on the opinions and treatment of the medical staff and that he should have taken action to see that Plaintiff got proper care.

Defendant Hughs disputes Plaintiff's conclusions, stating that the "medical staff provided . . . medical care in accordance with professional and constitutional standards." (Dkt. # 74 at 24). Defendant Hughs stated that he has "routine contact with the nurses or CHC doctor when they are at the" OCJ. (Dkt. # 73-6). Thus, Defendant was "aware through some written correspondence, medical records and conversations with CHC medical staff that CHC medical staff was repeatedly seeing, addressing and treating [Plaintiff's] alleged medical issues." Id. At no time did Defendant Hughs "believe the medical care provided to [Plaintiff] or any other inmate at the [OCJ was] inadequate or that any medical care to [Plaintiff] was unreasonably delayed or denied." Id. Nor was Defendant Hughs ever advised by CHC medical staff that there was ever any "interference in the providing of medical care to an inmate by any [OCJ] staff member." Id.

Additionally, there was no "reason [for Defendant] to doubt the adequacy of the medical care provided . . . or to believe [Plaintiff] was not getting appropriate, necessary, reasonable and timely medical care." (Dkt. # 74 at 24). Prior to Plaintiff filing this action, Defendant Hughs was not "aware of any complaints concerning the medical care provided by CHC medical staff," nor was Defendant Hughs "aware of any finding that CHC or its health care providers had] improperly denied or unreasonably delayed any inmate any medical care for a serious medical need." (Dkt. # 73 at 21, 22).

The record demonstrates that it was reasonable for Defendant Hughs to rely on the CHC medical staff treating Plaintiff while he was at the OCJ. The Special Report reflects continual medical attention by the CHC staff spanning the 6-month period from late July 2012 through

January 2013.  (Dkt. # 73-3).  The medical staff made several attempts to manage Plaintiff's back pain, ordered x-rays, provided instructions for extra bed mats and soft-soled shoes, sought referrals for MRI, and sought consultation with Plaintiff's prior physician in order to gain more information about past treatments for Plaintiff.  Id.  The Court also notes that, in late November 2012, Plaintiff was found to be hoarding pain medications, in non-compliance with the pain management regime prescribed by the medical staff. (Dkt. # 73 at 13).  Yet, even after Plaintiff was found to be hoarding medication, the medical staff continued to treat Plaintiff and put him on a different pain medication regime.  The Court finds nothing in the Special Report or elsewhere in the record that controverts the conclusion that it was reasonable for Defendant Hughs to rely on the opinions and treatment of Plaintiff by CHC medical staff.

Finally, Defendant Hughs argues that, inasmuch as Plaintiff sued him in his official capacity, the claims against him cannot stand because he does not have "final policy-making authority for the Jail." (Dkt. # 74 at 26).  Further, because Plaintiff "failed to demonstrate any violation by Defendant Hughs of his constitutional rights . . . [and] failed to cite any evidence to demonstrate that Defendant Hughs had any role or authority in adopting policies at the [OCJ] . . . Plaintiff . . . cannot establish municipal liability against Defendant Hughs in his 'official' capacity." Id. at 27.  The Court agrees. Plaintiff has failed to show that Defendant Hughs had any role or authority in adopting policies at the OCJ.  To the extent that Defendant Hughs is sued in his official capacity, he is entitled to summary judgment.

### b.    Qualified Immunity

Defendant Hughs argues that he is entitled to qualified immunity against all of Plaintiff's claims.  (Dkt. # 74 at 35).  Qualified immunity is discussed infra., Section D.

### c.      Summary as to Defendant Hughs

Based on the foregoing discussion, the Court finds that Plaintiff has failed to controvert Defendant Hughs' summary judgment evidence.  He has failed to demonstrate the existence of a genuine dispute of material fact.  Thus, Defendant Hughs is entitled to summary judgment.

### 4.      Defendants Mark Oatman, M.D. and Nurse Natasha Hart

Defendants Oatman and Hart are employed by CHC and carry out the duties of their employment at the OCJ based on a contract for services between CHC and the OCJ.  Defendants filed a motion to dismiss for failure to state a claim in response to Plaintiff's third amended complaint.  (Dkt. # 75).  After reviewing the motion, the Court found it necessary to consider information outside the third amended complaint and gave notice that it would treat the motion to dismiss as a motion for summary judgment.  (Dkt. # 113).  Plaintiff filed a response. (Dkt. # 114).

Defendants raise four arguments: (1) Plaintiff failed to properly serve Defendants, (2) Plaintiff cannot demonstrate that Defendants acted with deliberate indifference, (3) Defendants are entitled to qualified immunity, and (4) Plaintiff's due process claim should be dismissed.  (Dkt. # 75).  Plaintiff responded to Defendants motion (Dkt. # 90), Defendants filed a reply (Dkt. # 95), Plaintiff filed a surreply (Dkt. # 97), and Plaintiff filed a second response. (Dkt. # 114).

### a.      Improper service

Defendants first argue that the type of service effectuated is improper under Fed. R. Civ. P. 4(e).  The U.S. Marshal certified that he effected service by serving a dispatcher at the Osage County Sheriff's Department. (Dkt. ## 47, 48).  Defendants argue that this service would be proper under Rule 4 only if the dispatcher "is 'an agent authorized by appointment of by law to received service of process.'" (Dkt. # 75 at 8) (internal citations omitted).  Defendants state that she is not so

authorized. Id. at 9.  This Court recognizes that pro se plaintiffs who are prisoners have limited ability to determine proper location for service.  While the service upon Defendants Oatman and Hart does not fully comply with Rule 4, the Plaintiff in this case is a pro se prisoner and the Court must provide some leeway.

Even though Plaintiff failed to comply with proper service requirements, this Court concludes that the service by the U.S. Marshal was "reasonably calculated, under all circumstances, to apprise the interested parties of the pendency of the action and to afford them an opportunity to present their objections." United States v. Clark, 84 F.3d 378, 380 (10th Cir. 1996).  Plaintiff stated in his reply that the OCJ was proper place for service because it was the "place of employment or contract services." (Dkt. # 90 at 4).  Additionally, Defendants Oatman and Hart do not claim they were prejudiced by the improper service and appear to have had actual notice of the pending lawsuit and claims.  Defendants provided affidavits and copies of Plaintiff's medical file for the Special Report (See Dkt. # 73, Exs. 2, 8, and 9) and filed their motion to dismiss (Dkt. # 75) the same day the Special Report was filed.  Defendants also do not make any claims that they did not receive copies of the third amended complaint.  Given these facts above, the service on Defendants satisfies due process. Defendants' argument based upon improper service fails.

**b.      No deliberate indifference by Defendants Oatman and Hart**

Defendants Oatman and Hart next argue that they are entitled to summary judgment because Plaintiff cannot support his claim of deliberative indifference to a serious medical need, because the information in the Special Report shows that "Plaintiff received medical care and treatment on multiple occasions." (Dkt. # 75 at 12).  In Count III of the third amended complaint, construed broadly, Plaintiff alleges that the medical staff was deliberately indifferent to a serious medical need.

(Dkt. # 34 at 6). Plaintiff claims to have "made every available attempt to get medical attention, [including] verbal communication with staff members [and] submitting dozens of request to staff forms." Id. at 3. "After being ignored by jail staff . . . and no response from medical staff[,]" Plaintiff "began to write letters." Id. at 4. Plaintiff states that Defendant Hart then informed him that he was not hurt and "only had arthritis." Id. Plaintiff also appears to imply that it was not until this action was filed that he received any attention from Defendant Oatman. Id.

Plaintiff offers numerous exhibits in support of his allegations of deliberate indifference to a serious medical need. These exhibits include ten medical requests and/or grievances spanning approximately four weeks in time, ten letters written by Plaintiff addressed to various defendants, and an assortment of documents relating to Plaintiff's incarceration at the OCJ. See Dkt. # 34, Exs. A, B, and C. The letters include allegations of "medical neglect," an "incorrect diagnosis listed on the radiology report," and requests for different forms of medication and an MRI for a "proper diagnosis." See e.g., id. at Ex. B-4, C-1. Plaintiff's responsive filings offer additional facts and assertions in support of his claim. (Dkt. ## 90, 92, 93, 97, 100, 101).

Plaintiff identifies specific grievances against Defendants Oatman and Hart. Plaintiff alleges that Defendant Oatman "failed in his duty as a licensed physician by not considering what type of compounded or increased damage or trauma may have been done to already herniated discs" from the alleged "beating" by Officer Horne. (Dkt. # 90 at 7). Plaintiff cites to the fact that Defendant Oatman "continually list[ed] an incorrect diagnosis of Plaintiff's pre-existing condition as 'cronic [sic] back disease'" instead of "ruptured disks," (Dkt. # 90 at 10); that Defendant Oatman based his opinion on Defendant Hart's evaluation and failed to acknowledge the "real injury," which "failed in his ethics" (Dkt. # 92 at 3, 6); that Defendant Oatman "never looked at [Plaintiff's] x-rays," (Dkt.

# 114 at 2); and that Defendant Oatman "failed" to provide medication. (Dkt. # 34 at 5). Plaintiff alleges that Defendant Hart covered up the true extent of his injuries and expresses dissatisfaction with the attention given to him by Defendant Hart during her initial evaluation after Plaintiff's booking. See, e.g., Dkt. # 90 at 5-6. Plaintiff alleges Defendant Hart "described what to look for" to the radiologist and "pre-prepared the report" for the radiologist who read Plaintiff's x-rays. (Dkt. # 90 at 7). Plaintiff also alleges that "any and all specialized consultation on testing was pre opinioned [sic] by Nurse Hart, with no indication of the real issues even mentioned or considered . . . ." Id. at 9.

Ultimately, Plaintiff alleges that Defendants "not only refused medical attention and treatment, they also failed to mention the cause of his complaints [when seeking referrals for testing . . . and are] in concert with all the other defendants and . . . their associates." (Dkt. # 90 at 10-11). Plaintiff argues that the circumstantial evidence and "documented records of facts from outside professional sources" show that the Defendants had the "requisite knowledge of substantial risk." (Dkt. # 97 at 3). Further, Plaintiff appears to argue that the Defendants were deliberately indifferent to his serious medical needs because they were aware of his "pre-existing serious lumbar spine condition," yet failed to provide adequate pain medication or an MRI for a proper diagnosis. Id. at 4. It is this failure, Plaintiff argues, that was "the unnecessary and wanton infliction of pain," violating the Eighth Amendment ban on cruel and unusual punishment. Id. (citing Estelle v. Gamble, 429 U.S. at 104).

Defendants argue that the Eighth Amendment is "not violated when a doctor simply resolves 'the question whether additional diagnostic techniques or forms of treatment is indicated.'" (Dkt. # 75 at 12) (quoting Estelle v. Gamble, 429 U.S. at 107). They further argue that "[a] claim is

actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious[] . . . [and] not a difference of opinion between a prisoner and prison medical staff regarding the treatment or diagnosis of a medical condition." Id. (citing Heidtke v. Corr. Corp. of America, 489 F. App'x 275, 282 (10th Cir. 2012) (unpublished); Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993)).

After a review of the record, the Court finds that there was a difference in opinion between Plaintiff and the medical staff with regard to diagnosis and need for additional treatment, and not deliberate indifference to a serious medical need.  Plaintiff received constant medical attention while at the OCJ.  The actions taken by Defendants Oatman and Hart are recorded on various prisoner request forms, provider orders, progress notes, and affidavits, and are part of the Special Report. See Dkt. # 73-3.  The record clearly shows continual care and treatment for Plaintiff while he was incarcerated at the OCJ.  At no time did either Oatman or Hart disregard an excessive risk to Plaintiff's health or safety.  Defendant Oatman was very much aware of Plaintiff's back condition. See, e.g., Dkt. # 73-3 at 1.  Defendant Oatman weighed his treatment options for Plaintiff based on his own knowledge of Plaintiff's history of back problems, the results from the August 9, 2012 x-ray, and his physical examination and observations of Plaintiff.  At no time did Defendant Oatman indicate that he believed Plaintiff was in serious need of emergency care, nor did he ignore any indications of a serious medical need.

Defendant Hart also conducted her own examinations of the Plaintiff and reviewed each of Petitioner's request forms.  (Dkt. # 73-9).  Had she believed Plaintiff needed additional medical attention, she had the ability to make such recommendations.  (Dkt. # 73 at 18).  Yet, nothing in the

record indicates that Defendant Hart saw a need for additional medical attention, nor does the record indicate that she exhibited deliberate indifference.

A final point of discussion concerning Plaintiff's claim of deliberate indifference to a serious medical need arises from Plaintiff's reply dated October 8, 2013.  (Dkt. # 114).  Plaintiff states that, after he was transferred to the custody of the Oklahoma Department of Corrections and "after months of red tape," he was seen by a doctor and x-rays were taken.  (Dkt. # 114 at 2).  Plaintiff states that the doctor "immediately saw not only the need for surgery of the lumbar spine, but also noticed staples in the Plaintiff's hip had been stomped loose."  Id.  Plaintiff also provides a "partial MRI report from the O.U. Medical Center," dated August 28, 2013, which Plaintiff claims "clearly verifies serious injury of several ruptured and torn discs and should indicate the abuse endured." Id.

Plaintiff misinterprets the MRI report provided.  At the bottom of the MRI report, in the section titled "Impression," the doctor reviewing the images states, "Degenerative just [sic] changes as outlined above. At L4-L5 and L5-S1, broad-based disc bulges and facet hypertrophy contribute to moderate bilateral neuroforaminal stenosis." (Dkt. # 114 at 5).  A term search using the website for the National Institutes of Health (NIH) (www.nih.gov) and The Merck Manual (www.merckmanuals.com) reveals that the MRI report indicates that Plaintiff has degenerative back disease.  Plaintiff's "moderate bilateral neuroforaminal stenosis" is a type of spinal stenosis where there is a narrowing of the spinal column that causes pressure on the spinal cord.  Additionally, the MRI report does not include an indication of ruptured or torn discs.  Further, the MRI report does not, as Plaintiff asserts, verify a serious injury of ruptured discs nor does it "indicate the abuse endured."  Instead, the MRI report is consistent with the diagnosis by Defendant Oatman.

The Court finds that Defendants Oatman and Hart were reasonable in their treatment of Plaintiff. Plaintiff fails to show they were deliberately indifferent to a serious medical need. Plaintiff fails to show a delay in medical care resulted in substantial harm. Plaintiff has also failed to controvert Defendants' summary judgment evidence. No genuine dispute of material fact exists. Therefore, Defendants Oatman and Hart are entitled to summary judgment.

### c.     Immunity

Defendants Oatman and Hart also argue they are entitled to immunity under the Eleventh Amendment or in the alternative, under qualified immunity. (Dkt. # 75). As explained above, "[i]n terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities." Steadfast Ins. Co., 507 F. 3d at 1253 (10th Cir. 2007) (citations omitted). Eleventh Amendment immunity does not apply.

Defendants' entitlement to qualified immunity is discussed infra., Section D.

### d.     Due Process claim should be dismissed

Lastly, Defendants argue that Plaintiff's Due Process claim in Count I should be dismissed. In Count I, Plaintiff alleges his right to due process was violated because the jail staff did not allow him to have emergency medical treatment at booking. (Dkt. # 34). For the reasons discussed earlier, Count I will be analyzed under an Eighth Amendment standard.

Defendant Oatman was not at the OCJ during or near the time of Plaintiff's booking, nor does Plaintiff raise allegations against Defendant Oatman in connection with medical treatment received during Plaintiff's booking. (Dkt. # 34). Thus, Plaintiff's third amended complaint fails to allege sufficient facts to support a claim against Defendant Oatman as to lack of emergency medical care during intake and Defendant Oatman is entitled to summary judgment.

Plaintiff does, however, raise allegations against Defendant Hart related to Plaintiff's booking. Defendant Hart examined Plaintiff in the hours immediately following Plaintiff's arrival at the OCJ. Defendant Hart states that she was advised by the OCJ staff "that an inmate had come in with a couple of scrapes on his face" and the jail staff asked her to "check him out." (Dkt. # 73-9). After her examination, she noted some bruising on his cheek, but she did not see any "injuries or medical conditions that required any treatment." Id.   Defendant Hart did not record her observations because "the examination was not pursuant to a written inmate request and there was no treatment recommended or needed." (Dkt. # 73-9 at 2). Plaintiff takes issue with Hart's examination and conclusions, arguing that Defendant Hart does not have "some sort of special ability to determine broken bones, or a damaged spine and doesn't seem to remember whether it was bruising or scrapes on Plaintiff's face." (Dkt. # 90 at 5). Plaintiff questions "the opinion of any person, looking at a 54 year old man . . . who's [sic] face was scraped (not scratched) but scraped, bruises covering his whole facial area, and one eye swollen closed." (Dkt. # 92 at 3). Plaintiff points to the facts in evidence and admitted to by Defendants that, following the evaluation by Defendant Hart, Plaintiff began submitting "almost daily" request forms for medical treatment as further proof that Defendant Hart failed to give proper medical care and was deliberately indifferent to a serious medical need during Plaintiff's booking. (Dkt. # 93 at 7).

Upon review of the record in the light most favorable to Plaintiff, the Court concludes that Defendant Hart was not deliberately indifferent to a serious medical need during her examination of Plaintiff following his booking at the OCJ. The Special Report includes objective evidence that fails to support Plaintiff's account of events. Both of the officers responsible for the booking process at the OCJ are trained to respond to medical emergencies and medical needs of individuals

brought in to the OCJ.  See Dkt. ## 73-5, 73-16.  Both Officer DeHaven and Officer Hutchinson stated that there was no indication Plaintiff required emergency medical treatment.  Id.  Officer DeHaven noted that "Mr. Cox did not complain of the injuries" during the booking process and that after "Mr. Cox was showered and the facial area cleaned . . . there [was no] evidence of any serious medical injury needing immediate medical treatment."  (Dkt. # 73-5 at 2).   Officer Hutchinson stated that he did not believe additional medical treatment "was necessary based on [his] observations, [Plaintiff's] demeanor and his statements during bookin[g]."  (Dkt. # 73-16 at 1, 2).  Further, the medical questionnaire completed during booking asks, "[d]oes inmate have any visible signs of trauma, illness, obvious pain or bleeding, requiring immediate emergency or doctor's care?" (Dkt. # 73-1 at 6).  The box for "No" is checked.  Finally, while the pictures taken of Plaintiff during his booking do show a scrape accompanied by some swelling and possible bruising on Plaintiff's face (see Dkt. # 73-14), neither eye is swollen, much less swollen shut, and there are no additional scrapes, cuts, or bruising on Plaintiff's face, head, or neck.  Thus, the Court concludes that there is no objective evidence to indicate that Defendant Hart was deliberately indifference to a serious medical need during Plaintiff's booking and there is no genuine dispute of material fact.  Therefore, Defendant Hart is entitled to summary judgment.

### e.       Summary as to Defendants Oatman and Hart

For the reasons discussed above, the Court finds that Plaintiff fails to provide sufficient evidence such that a trier of fact could reasonably find in his favor.  There is no dispute as to any material facts.  Therefore, Defendants Oatman and Hart are entitled to summary judgment in their favor.

D.      **Qualified Immunity**

1.      **Standard**

Qualified immunity is an affirmative defense and, once raised, plaintiff bears the burden to show defendant's actions violated a constitutional right and that the allegedly violated right was clearly established at the time of the conduct at issue. See Harlow v. Fitzgerald, 457 U.S. 800 (1982); Conn v. Gabbert, 526 U.S. 286 (1999); Allstate Sweeping, LLC v. Black, 706 F.3d 1261 (10th Cir. 2013). The Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), set forth a mandatory two-prong test to resolve all qualified immunity claims. Id. at 201. A court must first determine whether the facts alleged by plaintiff are sufficient to make out a violation of a constitutional right. If plaintiff is successful, then the court must determine whether the right was "clearly established" at the time of the defendant's alleged misconduct. Id. "If no constitutional right would have been violated were the allegations established," then no further inquiry regarding qualified immunity was required. Id. The Supreme Court, however, has stepped back from the mandatory nature of this two-prong analysis (see Pearson v. Callahan, 555 U.S. 223 (2009)), and now permits courts to "exercise [their] sound discretion in deciding whether to bypass the first question and proceed directly to the second." Lynch v. Barrett, 703 F.3d 1153 (10th Cir. 2013). This is the same standard the Tenth Circuit cites as a "heavy two-part burden" on the plaintiff when a defendant asserts qualified immunity. See Maldonado v. City of Altus, 433 F.3d 1294, 1314-15 (10th Cir. 2006); Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001) ("If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." Id. at 1156.).

44

The Tenth Circuit has stated that "[i]n the area of § 1983 immunities, the critical distinction is not between employer and individual defendants, but between defendants that are governmental bodies and other defendants." DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 844 F.2d 714, 723 (10th Cir. 1988). It held that "when private parties act pursuant to contractual duties and perform governmental functions, they can claim qualified immunity." Id.; see also Rosewood Services Inc. v. Sunflower Diversified Services, Inc., 413 F.3d 1163 (10th Cir. 2005) (affirming its holding in DeVargas that qualified immunity can apply to a private party or corporation acting pursuant to a contract with a government).

### 2.      Standard applied to Defendants in their individual capacity

CHC contracted with the OCJ, a governmental body, to provide healthcare services to inmates housed at that facility. Therefore, Defendant Goetz, as CEO of CHC, may assert entitlement to qualified immunity. Defendant Goetz argues that Plaintiff fails to meet the "heavy two-part burden" set forth in Maldonado v. City of Altus. The Court agrees. Plaintiff fails to show the violation of a constitutional or statutory right by Defendant. Defendant Goetz is entitled to qualified immunity.

Defendants Koch and Hughs argue they are entitled to qualified immunity in their individual capacity because Plaintiff "failed to show any personal participation in any violation of his constitutional rights by [the Defendants]." (Dkt. # 74 at 33). Thus, since "no constitutional right on the facts alleged would have been violated, no further inquiry is required." Id. at 32 (quoting Saucier, 533 U.S. at 200-01). The Court agrees. Plaintiff fails to establish a constitutional violation by Defendants Koch and Hughs. Therefore, they are entitled to qualified immunity.

45

Defendants Oatman and Hart are employed by CHC, which is contracted by the OCJ to provide medical care to the inmates housed at that facility. The Tenth Circuit has held that "when private parties act pursuant to contractual duties and perform governmental functions, they can claim qualified immunity." DeVargas, 844 F.2d at 723 (10th Cir. 1988). Defendants were carrying out contractual duties, and as such can claim qualified immunity. Defendants argue that Plaintiff "cannot demonstrate either objective or subjective conduct that establishes a violation of his constitutional rights." (Dkt. # 75 at 15). The Court agrees. Defendants Oatman and Hart are entitled to qualified immunity.

**E.      New claims raised in Plaintiff's responses**

In Plaintiff's responsive filings, the Court notes that Plaintiff appears to raise potential claims that are not included in Plaintiff's third amended complaint.[13] These claims, to the extent they are new, are not properly before the Court. The Court must look only to the third amended complaint when assessing plaintiff's claims, since an amended complaint supercedes and replaces the original and all other prior complaints. Mink v. Suthers, 482 F.3d 1244 (10th Cir. 2007) (citing In re Atlas Van Lines, Inc., 209 F.3d 1064, 1067 (8th Cir. 2000)); see also LCvR 9.2(c). The Court cannot allow a party to amend his complaint through subsequent motions or responses to motions. Inasmuch as Plaintiff raises possible new claims in his responsive filings, the new claims are not permitted and the Court will not consider them.

---

[13]For example, in addition to the alleged "hate crime" and conspiracy statements, Plaintiff also appears to claim (1) improper coercion during a plea bargain (see Dkt. # 90 at 3, 8); (2) fabrication of charges of hoarding medication and possession of contraband by jail staff (Dkt. ## 92 at 7-8, 93 at 11); (3) confiscation and destruction of legal documents (Dkt. ## 93 at 1-2, 97 at 5); (4) conditions of confinement claims (Dkt. # 93 at 13); and, (5) denial of access to the law library at DOC facility (Dkt. # 101 at 1).

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1.   The amended motion to dismiss filed by Defendant Douglas Goetz (Dkt. # 76) is **granted**, and all claims against Defendant Goetz are dismissed with prejudice for failure to state a claim upon which relief may be granted.  28 U.S.C. § 1915(e)(2)(B)(ii).

2.   The motion to dismiss by Defendant Ty Koch (Dkt. # 74) is **granted**, and all claims against Defendant Koch are dismissed with prejudice for failure to state a claim upon which relief can by granted.  28 U.S.C. § 1915(e)(2)(B)(ii).

3.   The motion for summary judgment filed by Defendant Otis Hughs (Dkt. # 74) is **granted**.

4.   The motion to dismiss filed by  Defendants Dr. Mark Oatman and Natasha Hart (Dkt. # 75), converted to a motion for summary judgment (Dkt. # 113), is **granted**.

5.   Plaintiff's motion to "disqualify immunity" (Dkt. # 115) is **declared moot**.

6.   This is a final order terminating this action.

7.   A separate judgment shall be entered in this matter.


**DATED** this 12th day of November, 2013.


CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

47